FILED

2013 Aug-13  PM 01:56
U.S. DISTRICT COURT
N.D. OF ALABAMA



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| **DONALD J. HUDDLESTON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No.  CV-11-S-4329-NW** |
| | ) | |
| **SUNSHINE MILLS, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Plaintiff, Donald J. Huddleston, who is proceeding *pro se*, asserts claims against his former employer, defendant Sunshine Mills, Inc., for race discrimination pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and for retaliation and failure to pay overtime pay pursuant to the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 201 *et seq.*[1]  The case currently is before the court on defendant's motion for summary judgment.[2]    Upon

---

[1] *See* doc. no. 11 (Amended Complaint).  Plaintiff's Amended Complaint originally also contained claims for: (1) "Falsifying Business Records Under Violation of Alabama State Law Title 13A-9-45" (Third Claim for Relief); (2) defamation of character (Fourth Claim for Relief); (3) "Fraudulent Statement With Malicious Intent" (Fifth Claim for Relief); and (4) "Defamation *Per Se*" (Sixth Claim for Relief).  *See generally* Amended Complaint.  However, this court entered an order on April 10, 2012, dismissing the Third, Fourth, Fifth, and Sixth Claims for Relief.  Doc. no. 17, at 20.  The court construed plaintiff's First Claim for Relief — which contained allegations of civil rights violations based on race discrimination in plaintiff's employment — as being brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), despite the fact that plaintiff had attempted to assert the claim under 42 U.S.C. § 1983 instead.  *See* doc. no. 17, at 12-13.

[2] Doc. no. 33.

consideration of the motion, briefs, and evidentiary submissions, the court concludes the motion should be granted in part and denied in part.

## I.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment."  *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  Inferences in favor of the non-moving party are not unqualified, however.  "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation."  *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (alteration supplied).  Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the

outcome of the case.  The relevant rules of substantive law dictate the
materiality of a disputed fact.  A genuine issue of material fact does not
exist unless there is sufficient evidence favoring the nonmoving party for
a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis supplied).  *See*

*also Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether

the evidence presents a sufficient disagreement to require submission to a jury or

whether it is so one-sided that one party must prevail as a matter of law").

## II. SUMMARY OF FACTS

### A.    The Parties

Defendant, Sunshine Mills, Inc., operates a pet food and pet treat manufacturing

facility in Red Bay, Alabama.[3]  Plaintiff, Donald (or "D.J.") Huddleston, an African-

American male, began working for Sunshine Mills in 2006 as a Machine Operator in

Sunshine Mills' Tupelo, Mississippi facility.[4]  He was transferred to Sunshine Mills'

Red Bay facility in 2008, and he continued to work there until the termination of his

employment on December 21, 2010.[5]  He worked the first shift, or from 7:00 a.m. to

3:00 p.m., on the "pupcorn" production line.[6]

### B.    Defendant's Policy Guidelines

---

[3] Defendant's evidentiary submission, Exhibit 1 (Declaration of Janeice Gober) ¶¶ 2-3.

[4] *Id.* ¶ 3; defendant's evidentiary submission, Exhibit 2 (Deposition of Donald Huddleston), at 93, 188, 195-96.

[5] Huddleston Deposition, at 132-33, 137-38; Gober Declaration ¶ 3.

[6] Gober Declaration ¶ 3; Huddleston Deposition, at 92.

Defendant's workplace policies are set forth in a document called the "Policy Guidelines for Sunshine Mills, Inc." (the "Policy Guidelines"). The Policy Guidelines are distributed to each new employee, and they are re-distributed to all employees anytime they are updated.[7] Plaintiff acknowledged during his deposition that he received a copy of the Policy Guidelines when he began working at Sunshine Mills, and that he read and understood the policies contained therein.[8]

The Policy Guidelines state the following with regard to at-will employment:

> Sunshine Mills, Inc. is an at-will employer. This means that regardless of any provision in this employee handbook, either the employee or Sunshine Mills, Inc. may terminate the employment relationship at any time, for any reason, with or without cause or notice. Nothing in this employee handbook or in any document or statement, written or oral, shall limit the right to terminate employment-at-will. No officer, employee or representative of Sunshine Mills, Inc., is authorized to enter into an agreement — express or implied — with any employee for employment other than at-will, unless those agreements are in a written contract signed by the President of Sunshine Mills.[9]

The Policy Guidelines also state that all employees are classified as either "exempt" or "non-exempt" under the Fair Labor Standards Act, and that non-exempt employees "are entitled to overtime pay and are generally paid on a per-hour basis."[10]

---

[7] Gober Declaration ¶ 10.  *See also* defendant's evidentiary submission, at Exhibit 6 (Copy of Policy Guidelines).

[8] Huddleston Deposition, at 218-21.

[9] Defendant's Exhibit 6, at 2.

[10] *Id.*

Plaintiff acknowledged during his deposition that he was a "non-exempt" employee.[11]

Sunshine Mills also has an Equal Employment Opportunity policy that states:

> Sunshine Mills maintains a policy of nondiscrimination with employees and applicants for employment, training, promotions, discipline, termination, job assignments, and compensation. The company does not discriminate unlawfully in employment practices based on race, color, mental disability, or any other basis prohibited by statute. Efforts will be made to hire the best-qualified person available to Sunshine Mills at the time a position is open.[12]

The "Performance Planning" policy for Sunshine Mills states:

> Employee performance is important to our organization. Periodically Plant Managers and Supervisors will review each employee's job progress within our organization and help employees to set new job performance plans. Our performance-planning program is designed for all levels within the company.
>
> Our performance-planning program provides the basis for better understanding between the employee and his or her Manager/Supervisor, with respect to the employee's job performance, potential and development within the organization.
>
> Anyone working at Sunshine Mills (whether employed by Sunshine Mills or by a Staffing Service) will generally receive a formal performance review after 90 days on the job. This review provides Sunshine Mills an opportunity to communicate important performance related issues, such as quality of work and quantity of work, as well as other issues, such as attendance, that might impact an employee's overall ability to progress and grow with Sunshine Mills, Inc. It also provides employees an opportunity to formally communicate any job related issues or problems to the Plant Manager or Supervisor.[13]

---

[11] Huddleston Deposition, at 222-23.

[12] Defendant's Exhibit 6, at 3.

[13] *Id.* at 4.

The company's "Open Door Policy" states:

Sunshine Mills believes in the dignity of its employees and the right to a prompt, equitable, and sympathetic review of any question or difference of opinion an individual may have concerning his or her work situation. Employees have the right to ask a question or address a problem without fear of reprisal. Sunshine Mills has an Open Door policy, which is the employees' assurance of fair treatment.

Our goal is to assure fair treatment and respect to all employees. If questions or misunderstandings occur, we want to discuss them with you. Any time you have questions, criticisms, misunderstandings, or any other work related problem, you should:

1. Whenever possible, first try to resolve the matter with your immediate supervisor.

2. If the problem is still not resolved to your satisfaction contact your Plant Manager.

3. If the problem is not resolved to your satisfaction, then contact the Corporate Human Resources Manager.

No adverse action is to be taken against any employee presenting a question or difference of opinion under the Open Door Policy.[14]

The Policy Guidelines also provide that non-exempt employees will be paid overtime pay, at a rate of one and one-half times their regular pay, for each hour over forty worked during a week.[15] The Policy Guidelines do not contain any additional information about how overtime pay will be calculated, or when employees will be allowed or required to work overtime.

---

[14] *Id.*

[15] *Id.* at 2, 6.

6

### C.   Plaintiff's Probationary Period as a Maintenance Worker

In June of 2010, Jon McKinney and Terry Childers, both of whom were Maintenance Supervisors, agreed to offer plaintiff the opportunity to work in a maintenance position on a probationary basis for ninety days, because the Maintenance Department was short-handed and needed additional workers.[16] Plaintiff understood that the position was only temporary, and that he was not guaranteed a permanent position in maintenance after his probationary period was completed.[17] He also understood that neither his job title nor his pay would change during the probationary period.[18] However, if plaintiff had obtained a permanent position in maintenance, he would have received a pay raise.

Maintenance employees at Sunshine Mills are expected to be able to operate, service, and repair all of the machinery used at the plant.[19] Plaintiff had not previously worked in the maintenance department, but he was familiar with most of the machines from his experience in operating them, and he knew how to perform certain limited maintenance functions that often arose during the course of operating the machines on a day-to-day basis.[20] Even so, he did not know how to perform maintenance on *all*

---

[16] Defendant's evidentiary submission, Exhibit 4 (Declaration of Jonathan McKinney) ¶¶ 2-3; Huddleston Deposition, at 149-50, 166, 272.

[17] Huddleston Deposition, at 149-50, 273.

[18] *Id.* at 273-74.

[19] McKinney Declaration ¶ 4.

[20] Huddleston Deposition, at 155-57, 166, 170-71.

7

of the machines in the facility.[21]

After plaintiff had worked in maintenance for several weeks, McKinney and Childers concluded that his performance was not acceptable. Plaintiff worked slowly, and McKinney and Childers came to believe that he did not have the requisite knowledge or experience to maintain all of the machinery in the plant. McKinney and Childers agreed that plaintiff needed to return to his Machine Operator position.[22] They met with plaintiff on August 11, 2010, to inform him that he would be disqualified from his position in maintenance because he did not have enough experience to perform the job well.[23] Childers also informed plaintiff that if he attended a technical school or junior college to gain more formal training in the fields of electrics, mechanics, pneumatics, or hydraulics, he might once again be considered for a maintenance position.[24] Before the August 11 meeting, plaintiff did not know that McKinney or Childers had a problem with his job performance in maintenance.[25] Plaintiff also testified that Childers had never actually observed him working on any of the machines.[26]

---

[21] *Id.* at 171, 243-44.

[22] McKinney Declaration ¶ 4.

[23] *Id.* ¶¶ 5-6.

[24] *Id.* ¶ 6; Huddleston Deposition, at 145-46.

[25] Huddleston Deposition, at 341.

[26] *Id.* at 155, 159.

Plaintiff returned to his Machine Operator position on August 23, 2010. His pay remained the same as when he previously occupied the position.[27] Defendant then moved an individual named Frank Shott into plaintiff's position.[28] Although plaintiff asserts that Shott was white,[29] the court could not pinpoint any potion of plaintiff's deposition, or any other evidence in the record, that specifies Shott's race. Even so, defendant does not appear to dispute that Shott is white. After Shott took over plaintiff's position, he asked plaintiff questions about how to perform maintenance on some of the machinery.[30]

In May of 2010, defendant moved a white employee named Bill Bowling from a maintenance position to a Machine Operator position due to performance problems.[31] In October of 2010, defendant moved another white employee, Joseph Duncan, from a maintenance position to a Machine Operator position for the same reason.[32] It appears, though, that both Bowling and Duncan were permanent

---

[27] *Id.* at 141, 274.

[28] *Id.* at 152, 171-72.

[29] Doc. no. 40 (plaintiff's brief), at 38-39 ¶ 143 ("Sunshine does not dispute that after the removal of the plaintiff from the maintenance position that a Caucasian male, [sic] was put in his position.") (alteration supplied). Plaintiff cites the declarations of Jon McKinney and Terry Childers to support that assertion, but while the record contains a declaration from Jon McKinney (Defendant's Exhibit 4), it contains only an unsworn statement from Terry Childers. *See* defendant's Exhibit 9. Neither McKinney's declaration nor Childers' statement mentions Shott.

[30] Huddleston Deposition, at 154, 160-61, 164, 168-75.

[31] Gober Declaration ¶ 8.

[32] *Id.* ¶ 9.

maintenance employees, not probationary employees like plaintiff.[33]

## D.   Facts Related to Plaintiff's FLSA Claim

### 1.   Clock-in and overtime policies and procedures

All of defendant's hourly employees, including plaintiff, clock in and out of their shifts using a hand scanner system, which also is sometimes referred to as a "time swipe" system.[34]  Although it is not stated in the Policy Guidelines, defendant's Human Resources Manager and Plant Administrator both testified that defendant had a policy that employees are permitted to clock in no earlier than seven minutes prior to the beginning of their shifts.[35]  Plaintiff, however, testified that no such policy existed prior to December of 2010, and there is no document in the record memorializing such a policy prior to December of 2010.[36]

In addition to clocking in and out, machine operators are required to record all of their regular work hours on daily production sheets.  Those sheets document the quantity and type of feed produced on each shift and the number of hours worked by each employee on the shift.[37]  The Plant Administrator uses the time swipe reports and

---

[33] *See* Gober Declaration, at Exhibits 1 & 2.

[34] Gober Declaration ¶ 12; defendant's evidentiary submission, Exhibit 5 (Declaration of Deanette Sharp) ¶ 3; Huddleston Deposition, at 129.

[35] Gober Declaration ¶ 11; Sharp Declaration ¶ 4.

[36] Huddleston Deposition, at 78.

[37] Gober Declaration ¶ 12; Sharp Declaration ¶ 7 and Exhibit B; Huddleston Deposition, at 94-106.

the production sheets to determine how much each employee has worked during a pay period.  If there is a discrepancy between an employee's time swipe report and the production sheet, the Plant Administrator will confer with that employee's supervisor to determine whether the line may have started earlier or run longer that day.[38]

Defendant's Human Resources Manager testified that, at all times relevant to plaintiff's claims, defendant had a policy preventing employees from working overtime unless they had previously submitted a written overtime slip signed by their supervisor.[39]  However, that policy does not appear in written form in the Policy Guidelines, and plaintiff was not aware of the policy before December of 2010.[40]

### 2.    Plaintiff's clock-in practices

Plaintiff has alleged that defendant failed to pay him for overtime hours worked between August 30, 2010 and December 22, 2010.[41]  During that time period, plaintiff worked ninety days.  On nineteen of those days, he clocked in before 5:00 a.m.  On twenty-five of those days, he clocked in before 6:00 a.m.  On forty-six days, he clocked in sometime between 6:00 and 6:53 a.m.[42]  Thus, during the ninety-day period for which plaintiff claims he is entitled to overtime pay, he clocked in to work more

---

[38] Gober Declaration ¶ 12; Sharp Declaration ¶ 7.

[39] Gober Declaration ¶ 12.

[40] Huddleston Deposition, at 78, 81-82.

[41] *Id.* at 280.

[42] Sharp Declaration ¶ 4 and Exhibit A.

than seven minutes prior to the start of his shift *every single day*.

No supervisor or other management employee ever asked plaintiff to work overtime, or to report to work early, during this ninety-day period.[43] Plaintiff testified during his deposition that he arrived at work early so he could escape heavy traffic and avoid long lines for clocking in during a shift change, and he clocked in upon arrival in order to collect some overtime pay.[44] He sometimes submitted an overtime slip to his supervisor when he arrived early, but he did not wait to see if the slip was approved by the supervisor before starting to work.[45] On approximately eight or nine occasions, plaintiff returned to his truck to "rest up" between his early clock-in time and the beginning of a shift.[46] On other occasions, he would do whatever work "was necessary that was around that was available for [him] to do," like fixing a printer or setting up a production line.[47] Plaintiff acknowledged during his deposition that he should not be paid for any time spent sitting in his truck.[48]

Plaintiff was counseled about his clock-in practices on two occasions. Deanette Sharp, the Plant Administrator, consulted with Tammy Humphries, the Plant

---

[43] Huddleston Deposition, at 305, 326.

[44] *Id.* at 293, 322-23.

[45] *Id.* at 361-65.

[46] *Id.* at 290-91.

[47] *Id.* at 297-98 (alteration supplied).

[48] *Id.* at 344.

Superintendent, and "confirmed there was no reason for Mr. Huddleston to be clocking in that early."[49]  Sometime during August or September of 2010, Sharp and Humphries told plaintiff that he would not be paid for the time between his clock-in and the beginning of his shift, and that his hours would be changed to reflect a work start time at the beginning of his shift, rather than his clock-in time.[50]  In response, plaintiff "did not confirm he was performing any work between the time he clocked in and the beginning of his shifts."[51]  Plaintiff continued to clock in early, so Sharp informed Dave Norton, the Plant Manager, who "confirmed there was no reason for Mr. Huddleston to be clocking in that early as there was no work for him to be performing at that time."[52]  In early September 2010, Norton and Addison Deaton, the Assistant Plant Manager, told plaintiff not to clock in any earlier than 6:30 a.m. for his 7:00 a.m. shift.[53]  Despite that directive, plaintiff continued to clock in early for his shifts.[54]  He clocked in before 6:30 a.m. well into November of 2010.[55]  Beginning on

---

[49]Sharp Declaration ¶ 5.  *See also* Gober Declaration ¶ 4 (stating that Tammy Humphries was the Plant Superintendent in 2010); Sharp Declaration ¶ 2 (stating that Deanette Sharp is the Plant Administrator).

[50] Huddleston Deposition, at 307-09

[51] Sharp Declaration ¶ 5.

[52] *Id.* ¶ 6.

[53] Huddleston Deposition, at 292, 327-31.  *See also* Gober Declaration ¶ 4 (stating that Dave Norton was the Plant Manager, and Addison Deaton was the Assistant Plant Manager).

[54] Huddleston Deposition, at 310-12, 318-19, 330-31.  *See also* Sharp Declaration, at Exhibit A (Time Swipe Report).

[55] *See* Sharp Declaration, at Exhibit A (Time Swipe Report).

November 11, 2010, he began clocking in after 6:30 a.m., but before 6:53 a.m.[56]

On December 15, 2010, Sunshine Mills distributed a written memo to all of its employees. The memo was signed by Janice Gober, the Human Resources Manager, on December 7, 2010, and it stated, in pertinent part:

> We have had several questions asked regarding time worked, calling and various other issues. This document supersedes all other policies.

> ▸ **Clock in time** – clocking in prior to your regular scheduled work time must have prior approval from your immediate supervisor. You are allowed 7 minutes prior to your scheduled time to clock in.

> ▸ **Overtime** slips must be signed by you and authorizing supervisor and turned in to your payroll administrator for overtime payment prior to the end of the pay period (division may require daily).

> ▸ **Unauthorized overtime** will not be paid. Unauthorized time will be changed to reflect your regular scheduled work time (ex: 6:32 am will be changed to 7:00 am).[57]

Employees were asked to sign a copy of the memo to "acknowledge that you have read and understand the all of the [sic] above information."[58] Plaintiff received a copy of the memo, but he refused to sign it because his hours were already being changed.[59]

---

[56] *See id.*

[57] Defendant's evidentiary submission, Exhibit 7 (December 7, 2010 memo), at 1 (all emphasis in original). *See also* Huddleston Deposition, at 63-64, 331.

[58] Defendant's evidentiary submission, Exhibit 7 (December 7, 2010 memo), at 2 (alteration supplied).

[59] *See id.*; *see also* Huddleston Deposition, at 63-70.

Plaintiff did not know of any other employee working on his production line who refused to sign the memo.[60]  He also could not identify any other employee on his production line who clocked in early to earn overtime, or who worked overtime without getting prior approval.[61]

Plaintiff's clock-in and clock-out times often did not correspond to the times on his production sheets.[62]  He was paid based on the hours reflected on his production sheets, not the hours reflected on the Time Swipe Report.[63]  Plaintiff does not dispute that the production sheets accurately reflect the number of regular hours he worked on the line,[64] although he does assert that the overtime hours *not* reflected on the production sheets also should have been considered in calculating his pay.

## E.    The Termination of Plaintiff's Employment

On December 16, 2010, Dave Norton and Royal Witcher, the Chief Operating Officer, met with plaintiff to discuss his refusal to sign the memo that had been

---

[60] Huddleston Deposition, at 375-76.

[61] *Id.*  Plaintiff states in his responses to defendant's proposed statement of facts that, "[a]t times, Bobby Ashley and Xavier Gunn, machine operators of the extruder machines for pupcorn, clocked in when the plaintiff did."  Doc. no. 40, at 28 ¶ 115 (alteration supplied).  However, he does not provide any evidence to support that assertion, and the could find no reference in plaintiff's deposition to either Ashley or Gunn clocking in early.

[62] Sharp Declaration ¶ 7; Huddleston Deposition, at 331.

[63] Sharp Declaration ¶¶ 7-9.

[64] *See, e.g.,* Huddleston Deposition, at 281-89, 300-01, 310-13.

circulated the day before.[65]  Plaintiff told Witcher that he believed Sunshine Mills had "taken" time from him by not paying him for all of the overtime hours on his Time Swipe Reports before the December 15 memo had been circulated, and that he could sue Sunshine Mills for the time that was "taken."[66]  Witcher told plaintiff that he violated company policy every day he clocked in more than seven minutes prior to his shift.  He also asked plaintiff again to sign the December 15 memo, but plaintiff refused.[67]  Even after his meeting with Witcher and Norton, plaintiff continued to clock in more than seven minutes prior to the beginning of his shift.[68]

Norton and Witcher met with plaintiff a second time on December 21, 2010. Witcher told plaintiff, "you have continued to clock in at 6:30, so I'm terminating you for violating the company policy."[69]  Witcher stated in his declaration that he believed plaintiff's practice of clocking in early was not only a violation of company policy, but also a dishonest act.[70]

Dave Norton signed an Employee Termination Form on December 21, 2010, indicating that plaintiff's employment had been involuntarily terminated.  The

---

[65] Defendant's evidentiary submission, Exhibit 3 (Declaration of Royal Witcher) ¶¶ 2-5; Huddleston Deposition, at 59-60, 232.

[66] Huddleston Deposition, at 61-62.

[67] Witcher Declaration ¶ 5.

[68] Witcher Declaration ¶ 6; Sharp Declaration, at Exhibit A (Time Swipe Report).

[69] Huddleston Deposition, at 365; Witcher Declaration ¶¶ 6-7.

[70] Witcher Declaration ¶ 6.

Comment section of the form contained the following statement:

> Employee terminated for repeated violation of company time clock policy, stating employee not to clock in before 7 minutes prior to start of shift UNLESS authorized to do so by immediate supervisor or management to cover shortages in shift coverage.  In that event, must turn in approved overtime request form.[71]

Witcher never told plaintiff that he was being terminated for complaining about an FLSA violation, or for making any other complaint.[72]

### III.  DISCUSSION

**A.     Theories Plaintiff is Barred from Asserting**

In his response brief, plaintiff raised *for the first time* a disparate impact theory of discrimination.  He asserts that "[t]he maintenance department consisted of all-predominately Caucasian males," thus creating an adverse impact against African-Americans.[73]  He also asserts, more generally, that defendant has a practice of limiting the hiring and promotion of African-Americans to higher paying positions such as supervisors, maintenance, human resources, and management.[74]  Plaintiff did not mention disparate impact in his amended complaint,[75] and the deadline for adding

---

[71] Witcher Declaration ¶ 8 and Exhibit A.

[72] Huddleston Deposition, at 360-61.

[73] Plaintiff's brief, at 47 (alteration supplied).

[74] *Id.* at 50-51.

[75] *See* doc. no. 11 (Amended Complaint).

claims expired on August 6, 2012, at the latest.[76]  Moreover, plaintiff stated during his deposition that his only claims were for violations of the FLSA, and for race discrimination based on his removal from his maintenance position.[77]   It is well-established that a plaintiff may not raise a new claim or theory of relief for the first time in response to a defendant's motion for summary judgment.  *See Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.") (citing *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir.1996)).  *See also Smith v. Horner*, 839 F.2d 1530, 1534-35 (11th Cir. 1988) (holding that the district court was not required to analyze the facts under a disparate impact theory when plaintiff made no mention of that theory in pre-trial and post-trial filings, and only barely alluded to the theory during trial).   Thus, the court will not consider plaintiff's disparate impact theory of discrimination.

Plaintiff also asserts that the demographic composition of defendant's workforce can be considered as evidence to support his *disparate treatment* theory of discrimination because evidence of racial or ethnic imbalance in a workplace "is most often a telltale sign of purposeful discrimination."[78]  Even assuming the legal viability

---

[76] *See* doc. no. 30 (Scheduling Order entered on August 6, 2012) ¶ 1 ("No causes of action, defenses, or parties may be added.").

[77] Huddleston Deposition, at 336-37.

[78] Plaintiff's brief, at 53.

of that argument, plaintiff has not offered any evidence to support it.  He states:

> Statistically speaking, using the disparate impact theory, the defendant, during the plaintiff's employment at said company, employed at most, over 100 employees.  Of those 100 or more employees, on a statistical percentile scale, 5-8 employees (2-5%) were of a class of African Americans, 30 of which were Hispanics (20-25%), and the rest, Caucasians made up the remaining percentage (60-70%).  The protected class of African Americans occupied the low paying wage jobs while the Hispanics occupied the lower-to mid paying wage jobs and the remaining 60-75% of Caucasians occupied low-to-higher wage and salary jobs in the defendant's company.[79]

However, plaintiff does not disclose the source of those figures, and he does not cite any evidence to support them.  The court's independent review of the record also reveals no evidence to support plaintiff's statistical calculations.  Accordingly, the court will not consider those statistics in conjunction with *any* of plaintiff's claims.

Finally, defendant asserts that plaintiff may not pursue the breach of contract claims he raised for the first time in response to the motion for summary judgment. The court assumes that defendant is referencing plaintiff's argument that the implied contract exception to the at-will employment doctrine applies to him.[80]  To the extent plaintiff makes such an argument, it cannot be considered because plaintiff is raising

---

[79] *Id.* at 52.

[80] *See* plaintiff's brief, at 35-36 ("Mr. Witcher breached an implied contract between Sunshine and the plaintiff.  Mr. Witcher did not terminate the plaintiff in covenant of good faith because he terminated the plaintiff for refusal to follow the guidelines of a policy that violated statutory laws.  So the plaintiff's termination, and reason[s] behind his termination, lacks standing and is without merit.") (alteration in original); *id.* at 63-68.

it for the first time in response to summary judgment.  *See Gilmour,* 382 F.3d at

1315.[81]

## B.    Disparate Treatment Discrimination

Plaintiff claims that defendant discriminated against him on the basis of race

when it moved him from his probationary position in maintenance back to his position

as a machine operator in August of 2010.  Plaintiff does not claim to have direct

evidence of a race-based discriminatory animus.  Therefore, he must prove his claim

with circumstantial evidence, navigating the burden-shifting framework set forth in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Department of*

---

[81] It is worth noting, primarily for plaintiff's edification, that the federal anti-discrimination laws also constitute an exception to the at-will employment doctrine.

> Contract law typically governs the relationship between employer and employee, and absent an agreement to the contrary, either party can terminate the relationship at will.  This allows employers and employees the flexibility to end or make changes to the employment relationship without the threat of costly judicial intervention.  *See, e.g., Mattenson v. Baxter Healthcare Corp.*, 438 F.3d 763, 767 (7th Cir. 2006) (". . . he was an employee at will who could be fired for any reason not forbidden by the . . . law, such as failing to trim his mustache or eating with his fork in his left hand."); *see also Elrod*[ *v. Sears, Roebuck & Co*], 939 F.2d [1466,] 1470[ (11th Cir. 1991)]; *Alexander v. Cnty. of Fulton*, 207 F.3d 1303, 1341 (11th Cir.2000) ("it is not the court's role to second-guess the wisdom of an employer's decisions so long as the decisions are not [impermissibly] motivated").  But as *Mattenson* suggests, the at-will rule is not without limits.  *One of these limits is Title VII, which cabins the default rule by barring certain types of discrimination.*  As a prophylactic measure, Title VII also bars an employer from retaliating against an employee who opposes, or participates in the investigation of, an employment practice made unlawful by the statute. 42 U.S.C. § 2000e–3(a).

*Lloyd v. Housing Authority of the City of Montgomery, Ala.*, 857 F. Supp. 2d 1252, 1266-67 (M.D. Ala. 2012) (alteration in original, emphasis supplied).

*Community Affairs v. Burdine*, 450 U.S. 248 (1981). Under this analysis, a plaintiff must first establish a *prima facie* case of disparate treatment, which creates a presumption of discrimination. To rebut the presumption, the employer then must articulate a legitimate, nondiscriminatory reason for the disputed employment action. If the employer does so, the presumption of discrimination drops from the case, and the burden shifts back to the plaintiff to show that the defendant's proffered reason is merely a pretext for unlawful discrimination. *See McDonnell Douglas*, 411 U.S. at 802-05; *Burdine*, 450 U.S. at 252-56.

To establish a *prima facie* case of race-based discrimination, plaintiff must show that: (1) he is a member of a protected class, (2) he suffered an adverse employment action, (3) the employer replaced him with someone outside his protected class or otherwise treated similarly situated employees outside his protected class more favorably, and (4) he was qualified to perform the duties of his job. *See, e.g., Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1228 (11th Cir. 2002); *Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984).

It is undisputed that plaintiff, an African-American, is a member of a protected class. Additionally, while there may not be any evidence that employees of other races performed at the same level as plaintiff but were nonetheless allowed to retain

their positions in maintenance, there *is* evidence that plaintiff was replaced by a white employee after he was removed from maintenance. The third element of the *prima facie* case is therefore satisfied.

The second and fourth elements require more detailed consideration.

Defendant argues that plaintiff did not satisfy the second element because his removal from maintenance did not constitute an adverse employment action.

> Not all employer actions that negatively impact an employee qualify as "adverse employment actions." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1238 (11th Cir. 2001). Rather, only those employment actions that result in "a *serious and material* change in the terms, conditions, or privileges of employment" will suffice. *Id*. at 1239 (emphasis in original). "Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Id*.

*Howard v. Walgreen Co.*, 605 F.3d 1239, 1245 (11th Cir. 2010). Even so, "Title VII 'does not require proof of direct economic consequences in all cases.'" *Holland v. Gee*, 677 F.3d 1047, 1057 (11th Cir. 2012) (quoting *Davis*, 245 F.3d at 1239, and also citing *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64–65 (1986)). "Thus, a transfer can be adverse 'if it involves a reduction in pay, *prestige or responsibility*.'" *Holland*, 677 F.3d at 1057 (quoting *Hinson v. Clinch County, Georgia Board of Education*, 231 F.3d 821, 829 (11th Cir. 2000)) (emphasis in *Holland*).

Here, defendant argues that plaintiff did not suffer an adverse employment

22

action because:  he was only offered the opportunity to work in a maintenance position *on a probationary basis for ninety days*; he did not work the full, ninety-day probationary term; he was never guaranteed the maintenance position on a permanent basis; and his salary did not change, either upon being temporarily placed in the probationary maintenance position, or upon being removed from maintenance and returned to his former position.  Thus, according to defendant, "Mr. Huddleston's removal [from maintenance] amounted to nothing more than a reassignment."[82]  The court agrees with defendant.

Plaintiff also cannot satisfy the final element of the *prima facie* case of discrimination, *i.e.,* that was qualified to perform the duties of the maintenance job.  "An individual is 'qualified' for a position, for purposes of employment discrimination law, if he meets the criteria that the employer has specified for the position."  *Wright v. Southland Corp.*, 187 F.3d 1287, 1301 n.16 (11th Cir. 1999) (citing *Thornley v. Penton Publishing, Inc.*, 104 F.3d 26, 29 (2d Cir. 1997)).  It is undisputed that a full-time maintenance worker at Sunshine Mills must be able to maintain, use, and service all of the machinery at the manufacturing facility to which he is assigned.[83]  Plaintiff acknowledged that he did not know how to perform

---

[82] Doc. no. 34 (defendant's summary judgment brief), at 17 (alteration supplied).

[83] McKinney Declaration ¶ 4.  Plaintiff does not dispute that this is a requirement of the maintenance job.  *See* doc. no. 40, at 11 ¶¶ 55-56 (plaintiff does not dispute defendant's proposed fact statement that "[a] full-time position in maintenance at Sunshine required the ability to maintain,

maintenance on all of the machines used at the Red Bay facility,[84] and he offers no evidence to dispute defendant's assertion that he was not adequately performing his maintenance duties.

Plaintiff appears to assert that he was qualified for maintenance because he had experience operating a variety of machines, he performed limited maintenance on some of those machines,[85] and he received training on the machines.[86]  However, plaintiff's subjective belief that he was qualified based upon criteria different from those specified by defendant is not sufficient to create a genuine issue of material fact on the issue of qualification.  *See, e.g., Austin v. Progressive RSC, Inc.,* 265 F. App'x 836, 845 (11th Cir. 2008) ("[T]he only evidence presented by Austin to demonstrate that he was qualified for promotion consisted of his own opinion, which is insufficient without more.") (citing *Cooper v. Southern Co.*, 390 F.3d 695, 743 (11th Cir. 2004)).

Plaintiff also asserts that McKinney and Childers, the Maintenance Supervisors, never told him, before the date on which he was removed from maintenance, that he

---

service and use all machinery utilized at the facility") (alteration supplied).

[84] Huddleston Deposition, at 170-71.

[85] *See* plaintiff's brief, at 54 ("[T]he plaintiff operated a variety of machines within the defendant's facility. . . . [P]rior to being transferred to the maintenance department, the plaintiff engaged in maintaining machinery within [his] department and printing machines in diverse areas of the defendant's company . . . .") (first two alterations supplied, third alteration in original).

[86] *Id.* at 55 ("[T]he plaintiff was not only recommended on occasion by supervisors to be trained on new machinery that was brought into the facility, but was also recommended by the maintenance supervisor, Mr. John McKinney to train on them as well . . . .") (alteration supplied).

lacked the requisite knowledge or training for the position, or that he was otherwise unqualified. According to plaintiff, this was in violation of Sunshine Mills' Performance Planning policy, which states that management officials will "periodically" review each employee's job performance, and that employees will receive a formal performance review after 90 days on the job.[87] As an initial matter, plaintiff has offered no evidence to support these assertions. Even if he had, he has not explained how the supervisors' failure to tell him he was qualified means that he *was* qualified for purposes of satisfying the *prima facie* case. Moreover, the Performance Planning policy does not specify exactly how often the "periodic" reviews are supposed to take place, and a fair reading of the 90-day performance requirement indicates that it was intended to apply to new hires, not to existing employees placed in new positions. Courts have found that an employee's failure to meet job requirements during a probationary period can serve as evidence that the employee was not qualified to perform the duties of his job, even if the employee had not received negative feedback from his immediate supervisor. *See Ferrell v. Masland Carpets, Inc.*, 97 F. Supp. 2d 1114, 1124 (S.D. Ala. 2000) ("Nor does the fact that Eles said Ferrell was 'doing good' and gave her two satisfactory evaluations establish that Ferrell was qualified for a regular reeler position. Simply because a

---

[87]*See* defendant's Exhibit 6, at 4.

low-level supervisor compliments an employee's performance does not mean that an issue of triable fact has been created whenever a higher-level supervisor subsequently gives that same employee a negative evaluation. *See Abioye v. Sundstrand Corp.*, 164 F.3d 364, 369 (7th Cir. 1998). Accordingly, Ferrell has not established that she was qualified to work as a regular reeler simply because Eles did not criticize her performance."); *Mays v. U.S. Postal Serv.*, 928 F. Supp. 1552, 1566-68 (M.D. Ala. 1996) *aff'd*, 122 F.3d 43 (11th Cir. 1997) (holding that an employee was not qualified to perform the duties of her job when she did not meet her employer's expectations during a probationary period).

Because plaintiff has failed to establish a *prima facie* case of discrimination based upon his removal from the probationary maintenance position in August of 2010, and because the court separately finds that the totality of the circumstances do not give rise to an inference of race-based discrimination, *see Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1327-28 (11th Cir. 2011), summary judgment is due to be granted on his race-based disparate treatment claim.[88]

## C.    Fair Labor Standards Act

Plaintiff also asserts that defendant violated the Fair Labor Standards Act

---

[88] Moreover, because plaintiff has failed to establish a *prima facie* case, the court need not consider whether defendant's proffered legitimate, non-discriminatory reason for the employment decision was a mere pretext for unlawful discrimination.

because it reduced his hours and refused to pay him at the overtime rate for the time he worked prior to the start of his shifts between April and December of 2010, and because it terminated his employment in retaliation for his complaints about failing to pay his overtime pay.

### 1.    Altering time and failure to pay overtime

The FLSA provides that " no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a).  An employer "employs" an employee when that employee is "suffer[ed] or permit[ted] to work."  29 U.S.C. § 203(g).  An employee is "suffered or permitted to work" if "(1) he or she worked overtime without compensation and (2) the [employer] knew or should have known of the overtime work."  *Allen v. Board of Public Education for Bibb County*, 495 F.3d 1306, 1314-15 (11th Cir. 2007) (citing *Reich v. Dept. of Conservation and Natural Resources*, 28 F.3d 1076, 1081-82 (11th Cir.1994); 29 C.F.R. § 785.11) (alteration supplied).[89]

---

[89] 29 C.F.R. § 785.11 states:

Work not requested but suffered or permitted is work time.  For example, an employee may voluntarily continue to work at the end of the shift.  He may be a pieceworker, he may desire to finish an assigned task or he may wish to correct errors, paste work tickets, prepare time reports or other records.  The reason is immaterial.  The employer knows or has reason to believe that he is continuing to

It is not relevant that the employer did not ask the employee to do the work.  The reason that the employee performed the work is also not relevant.  "[I]f the employer knows or has reason to believe that the employee continues to work, the additional hours must be counted."

*Allen,* 495 F.3d at 1314 (quoting *Reich,* 28 F.3d at 1082) (alteration in *Allen*).

### a.   Uncompensated overtime

It is undisputed that defendant altered plaintiff's time records and did not pay him for all the hours he was clocked in.  Thus, the question becomes whether plaintiff actually was performing work during the hours and minutes between when he clocked in and when his shifts began.  *See* 29 CFR § 785.48(a) ("In those cases where time clocks are used, employees who voluntarily come in before their regular starting time or remain after their closing time, do not have to be paid for such periods *provided, of course, that they do not engage in any work*.  Their early or late clock punching may be disregarded.").

Plaintiff bears the burden of proving that he was working during those time periods, *Allen,* 495 F.3d at 1315, as opposed to sleeping in his truck, or engaging in desultory, undirected activities that served no useful purpose of his employer.  Even though this court seriously doubts that plaintiff can carry his burden of proof, there is a genuine issue of material fact with regard to whether plaintiff actually performed uncompensated overtime work between his clock-in time and the beginning of his

---

work and the time is working time.

shift.  Plaintiff acknowledged that there were days on which he clocked in earl,y but

sat in his truck to rest, and that he should not be paid for the time spent resting.

However, he also testified that, on other days, he performed work activities, albeit not

his regular production line duties.  Defendant suggests that plaintiff's testimony

should not be credited because he has no other witnesses or evidence to corroborate

it,[90] but that is not the standard for evaluating evidence on summary judgment.

Plaintiff's sworn deposition testimony that he sometimes performed work after

clocking in stands by itself and does not require corroboration.[91]  Defendant also

asserts that plaintiff's production sheets demonstrate that he was paid for all of the

hours he worked, because the time on the production sheets undisputedly is the same

as the time for which plaintiff was paid.  That assertion is unpersuasive, because there

is a fact dispute as to whether plaintiff worked hours *in addition to* those reflected on

the production sheets.  Plaintiff testified that the production sheets reflected only the

hours he actually worked on the production line, not the time he spent before his shift

performing other, alleged (but ill-defined) work-related tasks.

---

[90] *See* doc. no. 34 (defendant's brief), at 21 (asserting that plaintiff "has no witnesses or evidence to support he was performing work in between the time he clocked in and his shift started").

[91] Defendant is, of course, free to challenge the credibility of plaintiff's testimony *at trial* by pointing out that there is no corroborating evidence.  Defendant also is free to present evidence at trial — like the evidence it presented at summary judgment that plaintiff's supervisors saw no reason for him to be working during those hours — to directly contradict plaintiff's testimony.  At the summary judgment stage, however, plaintiff's version of events must be credited.

### b.    Defendant's knowledge of the unpaid overtime

The next issue is whether defendant had actual or constructive knowledge that plaintiff was working unpaid overtime.  *See Allen,* 495 F.3d at 1318 ("Plaintiffs' claims were viable if a reasonable jury could conclude from the evidence that the Board had actual or constructive knowledge.").  Neither party makes any substantive arguments in their briefs with regard to the knowledge element.

The Eleventh Circuit has held that

> "an employer's knowledge is measured in accordance with his 'duty . . . to inquire into the conditions prevailing in his business.'" *Gulf King Shrimp Co. v. Wirtz*, 407 F.2d 508, 512 (5th Cir. 1969) (quoting *People ex rel. Price v. Sheffield Farms-Slawson-Decker Co.*, 225 N.Y. 25, 121 N.E. 474, 476 (1918)).  An employer "'does not rid himself of that duty because the extent of the business may preclude his personal supervision, and compel reliance on subordinates. . . . *The cases must be rare where prohibited work can be done . . . and knowledge or the consequences of knowledge avoided*.'" *Id*. (quoting *People ex rel. Price*, 121 N.E. at 476).  In reviewing the extent of an employer's awareness, a court "need only inquire whether the circumstances . . . were such that the employer either had knowledge [of overtime hours being worked] or else had 'the opportunity through reasonable diligence to acquire knowledge.'" *Id*. (quoting *People ex rel. Price*, 121 N.E. at 476).

*Reich*, 28 F.3d at 1082 (alteration in original) (emphasis supplied) (footnote omitted).[92]

---

[92] The omitted footnote stated:  "In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*), the Eleventh Circuit Court of Appeals adopted as precedent all decisions of the former Fifth Circuit Court of Appeals rendered before October 1, 1981."  *Reich*, 28 F.3d at 1082 n.13.

It cannot reasonably be disputed that defendant was aware of the overtime hours plaintiff worked.[93]  Plaintiff clocked in using defendant's computerized time swipe system, and defendant has acknowledged reducing plaintiff's "clocked in" hours to correspond to his scheduled work hours.  Defendant obviously could not have reduced plaintiff's overtime hours if it was not aware of those hours.

Defendant asserts that "Ms. Sharp spoke with Mr. Huddleston's supervisors before reducing his time to ensure he was not working prior to the beginning of his shifts and there was no need for him to have clocked in early."[94]  If anything, this assertion actually serves as an additional indication that defendant *was* aware of plaintiff's overtime work.  Moreover, it is irrelevant whether some of defendant's management employees thought there was any "need" (or any "reason," as Ms. Sharp stated in her declaration)[95] for plaintiff to clock in early.  *See Allen,* 495 F.3d at 1314 ("It is not relevant that the employer did not ask the employee to do the work.  The reason that the employee performed the work is also not relevant.").

Defendant also suggests that notice of plaintiff's overtime work should not be imputed to it because it had a policy preventing employees from clocking in early, and

---

[93] This assumes — as the court has at the summary judgment stage — that plaintiff actually did perform work activity during at least some of the hours and minutes between clocking in and the beginning of his shifts.

[94] Defendant's brief, at 21-22.

[95] *See* Sharp Declaration ¶¶ 5, 6.

because plaintiff was counseled on at least two occasions to stop clocking in so early. There is a factual dispute regarding whether defendant had a policy, *prior to December 15, 2010*, preventing employees from clocking in more than seven minutes before the start of their shift.  Even if there was such a policy, however, case law and federal regulations both make clear that an employer cannot necessarily rely upon the policy to avoid FLSA liability for unpaid overtime.  FLSA regulations provide that

> it is the duty of the management to exercise its control and see that the work is not performed if it does not want it to be performed.  It cannot sit back and accept the benefits without compensating for them.  *The mere promulgation of a rule against such work is not enough*. Management has the power to enforce the rule and must make *every effort* to do so.

29 C.F.R. § 785.13 (emphasis supplied).

The Eleventh Circuit relied upon that regulation in *Reich*, when it rejected the employer's argument that it "could not be charged with knowledge of the overtime violations primarily upon the fact that supervisors repeatedly told the officers that overtime hours were prohibited."  *Reich*, 28 F.3d at 1083.  There was

> no indication in the record that the Department did anything at any time relevant to this litigation to discourage the overtime required by the vast majority of its officers to properly perform their duties other than to promulgate its policy against such work and to urge the officers to "work their best 40."  For example, no officer was ever disciplined for violating the forty-hour rule.

*Id.*  The employer "had a duty to do more than to simply continue to apprise the

officers of the policy." *Id.   See also Edmund v. City of Fort Myers*, No. 2:10–cv–474–FtM–29SPC, 2012 WL 28224, *5 (M.D. Fla. Jan. 5, 2012) ("[T]he existence of the City's overtime policy, standing alone, is insufficient to defeat plaintiff's FLSA claim."); *Reyna v. ConAgra Foods, Inc.*, No. 3:04-cv-39, 2006 WL 3667231, *5 (M.D. Ga. Dec. 11, 2006) ("Plaintiffs provided Defendants with daily time cards establishing the exact number of hours that they worked, and Defendants admit to receiving those time cards.   Furthermore, even assuming Plaintiffs' supervisor did not total the time which was submitted to payroll, the supervisor at least reviewed the time and approved the total number of hours worked.   These facts clearly establish that Defendants had actual knowledge that Plaintiffs were working overtime. *See Kissel v. U.S. Steakhouse Bar & Grill, Inc.*, No. 6:05-cv-58-Orl-JGG, 2006 WL 2850105, *3 (M.D. Fla. 2006) (defendants had actual knowledge of the hours plaintiff worked through the submission of her time cards).   *The fact that HR had a policy that all overtime must be approved does not shield Defendants from liability under the FLSA. See Reich*, 28 F.3d at 1082.") (emphasis supplied).

Here, it cannot be said that defendant made "every effort" to ensure that plaintiff did not work unpaid overtime.   Plaintiff was informed by various members of management on at least two occasions that he should not clock in early, but that is not sufficient under *Reich* to shield defendant from liability.   There is no indication

that defendant did anything else to prevent plaintiff from clocking in early. For example, plaintiff was not disciplined for violating the alleged check-in policy until his employment was terminated. *See Dominguez v. Quigley's Irish Pub, Inc.*, 790 F. Supp. 2d 803, 817 (N.D. Ill. 2011) (considering the fact that the employee had never been disciplined for clocking in early when evaluating whether the employer had notice of the employee's overtime work).[96]

In summary, there is a genuine issue of material fact with regard to whether plaintiff actually worked overtime hours for which he was not compensated. Further, based on the evidence presented at summary judgment, a reasonable jury could conclude that defendant had notice of plaintiff's overtime hours. Accordingly, summary judgment is due to be denied on plaintiff's claim for unpaid overtime.

## 2.    Retaliation

Plaintiff stated the following allegations of retaliation in his Amended Complaint:

> That it is illegal for the defendant, or any employer, to terminate an employee out of retaliation when an employee has imposed a law upon them to be invoked and pursued. The defendant was notified of their actions being in violation of the FLSA and days later the plaintiff

---

[96] Other examples of measures defendant could have taken to prevent plaintiff from clocking in early include: disabling plaintiff's time card from working until the beginning of his shifts; establishing a mechanism by which a management employee would be immediately alerted every time plaintiff attempted to clock in more than seven minutes prior to the start of his shift; or requiring plaintiff to personally "check in" with a management employee before electronically "clocking in" through the time swipe system.

was dismissed from the company.  The defendant's statement of "violating the company policy" was nothing more than an excuse that could not be proven or claimed.[97]

The FLSA makes it unlawful for any person to "discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter . . . .  29 U.S.C. § 215(a)(3).

> A prima facie case of FLSA retaliation requires a demonstration by the plaintiff of the following:  "(1) she engaged in activity protected under [the] act; (2) she subsequently suffered adverse action by the employer; and (3) a causal connection existed between the employee's activity and the adverse action." *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 208–09 (10th Cir.1997).  If the employer asserts a legitimate reason for the adverse action, the plaintiff may attempt to show pretext. *See id.*  In demonstrating causation, the plaintiff must prove that the adverse action would not have been taken "but for" the assertion of FLSA rights. *See Reich v. Davis*, 50 F.3d 962, 965–66 (11th Cir.1995).

*Wolf v. Coca-Cola Co.*, 200 F.3d 1337, 1342-43 (11th Cir. 2000) (alteration in original).

Defendant argues that plaintiff cannot prove a *prima facie* case of retaliation because he cannot demonstrate that he engaged in an activity protected by the FLSA. According to defendant, plaintiff "complained about Sunshine changing his time, not that Sunshine failed to pay him for time he actually worked."[98]  The court can discern

---

[97] Amended Complaint ¶ 45.

[98] Defendant's brief, at 24.

no reasonable difference in the substance of those two complaints. Plaintiff allegedly was not paid for all the time he worked *because defendant altered his time records* to eliminate time prior to the start of plaintiff's shifts. Defendant offers no other argument that plaintiff is unable to satisfy the *prima facie* case for retaliation, and, indeed, it appears that plaintiff: (1) engaged in statutorily protected activity when, on December 16, 2010, he told Royal Witcher that defendant had taken time from him and that he could sue defendant as a result; (2) suffered an adverse employment action when his employment was terminated on December 21, 2010; and (3) can demonstrate a causal connection between his protected activity and his termination due to their close temporal proximity. *See Thomas v. Cooper Lighting, Inc*., 506 F.3d 1361, 1364 (11th Cir. 2007) ("The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action.") (citing *Brungart v. BellSouth Telecommunications, Inc*., 231 F.3d 791, 798-99 (11th Cir. 2000)).

Defendant stated a legitimate, non-retaliatory reason for terminating plaintiff's employment, *i.e.,* that plaintiff repeatedly violated defendant's clock-in policy. Accordingly, the burden shifts to plaintiff to demonstrate that defendant's proffered reason actually is a pretext for retaliation. Plaintiff shoulders that burden by "cast[ing] sufficient doubt on the defendant's proffered nondiscriminatory reasons to

36

permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct' . . . ." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (quoting *Cooper-Houston v. Southern Railway Co.*, 37 F.3d 603, 605 (11th Cir. 1994)) (alteration supplied); *see also Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 135 (2000) ("[A] plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.") (alteration supplied).   The plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs*, 106 F.3d at 1538 (quoting *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1072 (3d Cir. 1996) (*en banc*) (internal quotation marks omitted).

Defendant asserts that plaintiff did not make any arguments about pretext in his response brief.[99]   Liberally construing the *pro se* plaintiff's brief, however, the court concludes he has asserted some arguments that might reasonably be considered

---

[99] *See* doc. no. 42 (defendant's reply brief), at 7 ("Absent from Mr. Huddleston's Amended Opposition is any argument as to why Sunshine's arguments are without merit.   As such, Mr. Huddleston has conceded Sunshine is correct, and his claim for retaliation is due to be dismissed with prejudice.").

responsive to defendant's pretext argument.[100]   First, plaintiff asserts that there was

no official policy in place, prior to December 15, 2010, that prohibited employees

from clocking in early.[101]   As discussed above, there is a genuine issue of material fact

as to whether such a policy existed prior to December 15, 2010, and that fact dispute

must be resolved in plaintiff's favor at summary judgment.   Even so, it is undisputed

that plaintiff was orally counseled on two occasions, beginning in late August or early

September of 2010, about his clock-in practices.   It also is undisputed that plaintiff

continued to clock in early even *after* the December 15 memorandum instituting the

clock-in policy[102] was circulated.   For these reasons, the dispute about the

commencement date of the clock-in policy do not cast sufficient doubt upon

defendant's proffered legitimate, non-retaliatory reason to warrant a finding of pretext.

Plaintiff also argues that he fell under an exception to at-will employment.

Even if the premise behind that argument is true,[103] it does nothing to undercut

---

[100] Plaintiff organizes these arguments under the heading:  "Reasons for the defendant terminating the plaintiff lacks standing."  Plaintiff's response brief, at 55.  That is not a proper use of the term "standing," which generally refers to a plaintiff's ability to assert a viable, justiciable, and remediable claim against the defendant.  After reviewing the substance of the arguments plaintiff asserts under this heading, however, it appears that plaintiff is challenging the validity of the proffered reason for the termination of his employment.

[101] Plaintiff's brief, at 55 ("Prior to December 15, 2010, there were [sic] no such official clock-in policy in place at the company of the defendant, neither is there any stated in the company policy handbook.").

[102] Defendant likely would characterize the December 15 memo as merely *memorializing* the clock-in policy, not instituting it.

[103] *See* notes 80 and 81, *supra.*

defendant's proffered legitimate non-retaliatory reason for terminating plaintiff's employment.  Defendant stated that it terminated plaintiff for repeatedly violating the clock-in policy, not because plaintiff was an at-will employee and could be terminated for any reason.  Plaintiff also asserts that if he was not an at will-employee, then defendant was required to follow certain procedures before terminating his employment, but he does not specify what those procedures might be, or how defendant failed to follow them.  There is no reasonable support for plaintiff's argument in the record.

Plaintiff also argues that "there was never any violation of the clock in policy to begin with" because defendant altered plaintiff's time records.[104]  Plaintiff appears to think that defendant's act of altering his time records to delete any hours prior to the start of his shift negates his violation of the policy by clocking in early.  That argument is nonsensical.  Any policy violations would have occurred *when plaintiff clocked in early*, not when he received payment for any overtime earned due to clocking in early.

Finally, plaintiff asserts that the clock-in policy is invalid because it is unlawful and unfair for an employer to alter an employee's time records.[105]  There is no basis

---

[104] Plaintiff's brief, at 57.

[105] *Id.* ("[T]he clock-in policy specifically states that the time will be 'changed to reflect your regular work schedule.'  It has been established, however, that such acts of tampering or altering business records violate statutory laws in which renders [sic] the clock-in policy, be it in whole or

for that assertion.  To the contrary, federal regulations specifically state that "early or late clock punching may be disregarded" as long as the employees are not actually performing any work.  29 CFR § 785.48(a).  Insofar as plaintiff actually was performing work during his pre-shift hours, he is, of course, due to be compensated for that work.  *See* Section III(C)(1), *supra*.  But defendant is nonetheless permitted to change his time cards, and to not pay him for any non-work-hours.

In summary, plaintiff has not offered sufficient evidence to support a reasonable inference that defendant's proffered legitimate reason for terminating his employment actually was a pretext for unlawful retaliation.  Accordingly, summary judgment is due to be granted on plaintiff's FLSA retaliation claim.

## IV.  CONCLUSION

In accordance with the foregoing, defendant's motion for summary judgment is due to be granted in part and denied in part.  Plaintiff's disparate treatment and FLSA retaliation claims will be dismissed with prejudice.  Plaintiff's FLSA claim for failure to pay overtime will proceed to trial.  An order consistent with this memorandum opinion will be entered contemporaneously herewith.

---

in part, unconstitutional, unethical, without merit and unjustifiable, and any such favorable claims to deem it fair would be barred in whole or in part in accordance of [sic] the unclean hands doctrine.") (alterations supplied).

DONE this 13th day of August, 2013.

_____
United States District Judge